The next matter, number 23-2030, Lisa Menninger v. PPD Development, L.P. At this time, would counsel for the appellant please introduce himself on the record to begin. Thank you. Doug Hallward-Dremeier on behalf of Appellant PPD, Your Honors. And if I may, I would like to reserve three minutes of my time for rebuttal. You may. Thank you, Your Honors. Dr. Menninger's disparate treatment and failure to accommodate claims should never have gone to a jury. The undisputed record establishes as a matter of law that she was not a qualified individual who was capable of performing the essential functions with or without reasonable accommodation. Dr. Menninger's own doctor indicated that she needed a surrogate or reader. In other words, a stand-in. That's one thing, but that's not the first thing she suggested. She first suggested more time and more information. But let me start with the essential functions. That's a question of fact with the burdens on the employer, isn't it? It is, Your Honor. And so the facts are there's a job description that talks generally about productivity, right? Helping client development, but in a very general sense. No discussion of making speeches. That's not specifically said in the job description. That's not the work she's being asked to do previously. There's the testimony about all these people have these job descriptions and the idea is swim in your lane, which I understand or a person could understand to mean we kind of designed the job within this broad job description for what you're good at. And that's the situation she's in until a certain point when it's that now you're going to make speeches. And then the question is whether that's essential. And you have an argument that it is, but there's a lot of things that point to it isn't. And it strikes me that that's for the jury to decide. Well, Your Honor, first we note several cases in which this precise question has been decided as a matter of law, even though contested in several of the same ways Your Honor identifies. And those are the Cushnet case, the Walgreens case, and the Friendlies case. The job description in this case was much more precise about these very functions than was, for example, the job description in Cushnet or in Walgreens. Here the job description, and this is at pages 29 and 19 to 20 of the JA, said to support practice development in obtaining new customers and maintaining relationships. It talked about interacting frequently with internal personnel and outside representatives, including the resolution of operational issues concerning projects and or contractual clarifications. And there are a lot of ways to do those that aren't giving speeches in front of large crowds. Well, the record was clear, and Dr. Meninger conceded that she had performed these very tasks before, but less frequently. And, of course, that was what the company said to her before it ever knew that she was disabled, was that it needed its managers to do more of the business development, be out there with its clients in order to achieve the company's business operations. And that's important because we know that the employer is entitled to significant deference in defining the responsibility. Here it was certainly within the written job description, and there was one other sentence that I wanted to highlight because it says, excellent interpersonal skills with ability to participate in developmental activities, present capabilities and solutions to clients. So especially in the pre-COVID, pre-Zoom era, when we're talking about participating in these development activities and presenting to clients, we're talking about doing so in person. And again, she did so, and the company said, we need more. Before it ever knew that she had this disability. And so the employer is entitled to define the job that they need their managers to perform. And, again, as I said before, this is even, it seems to me, a for sure much better case for judgment as a matter of law than we had in the Cushnet or in Walgreens. In the Cushnet, I believe, the job description was troubleshooting, and in Walgreens it was maintaining the store. If you look at this record as a whole, I do see evidence that they wanted her to leave. And so when we think about the essential function question, this is my question, when we think about whether that's a bona fide, good faith belief of the employer, or just part of the overall, we'd like her to go, can the jury take into account all that other stuff when it thinks about the question of fact in which the burden is on PPD about what is the essential function? So this, your honor, I think highlights two different things. The first is that we have not argued on appeal that we are entitled to judgment as a matter of law in the retaliation claim. We think it has to be retried because we think it's clearly infected by the legally deficient discrimination claims. But on the question of pretext, this is why it's so important that not only was this spelled out in greater detail in the written job descriptions, it was said to Dr. Meninger before the company knew she was disabled. And this is at JA 2923, because that's a letter from Dr. Meninger in which she actually discloses her disability to her employer, and in that letter she summarizes the discussion they had in December of 2017. That she had been requested that some of the new tasks you've suggested would include increased client visits, social interactions, and presentations, internal and external. Those are the precise words that were already in her written job description, and she was being told before the company ever knew she was disabled that they needed more. And it's entirely within their rights to say that they need their manager to do more. You mentioned the retaliation claim. And help me with this. I understand the threat of arguments in the briefs. Your only challenge to the retaliation claim is based on the challenge to the jury instruction on reader. No, Your Honor. The argument with respect to the retaliation claim is actually that, although there is evidence in the record that the jury might have concluded established retaliation, and they highlight, for example, the no new zero error request. In other words, there's no sufficiency challenge to the retaliation claim. No, but there is a legal error in it, that the jury was allowed to consider the desire to delicately work her out. In fact, when counsel in his closing argument started to talk about the retaliation claim, counsel started by emphasizing delicately work her out. Find an exit strategy. Of course, if she is not a qualified employee, then they are absolutely within their right to look for an exit strategy. In fact, that's the humane thing to do. At the very least, the jury could have considered that evidence very differently and could have considered the testimony very differently if they understood that she was not a qualified employee, that the employer was obligated to continue to employ. Also, the damages, of course, although PPD had requested a special verdict form identifying damages by theory of liability, that was not what the judge gave. So we have a unified damages award that would have to be vacated and retried as well. The usual rule with the general verdict form on damages is that if any of the theories of recovery could support the damages, they stand. We've got precedent on that. Well, but the Lattimore case, which we cite on page 43 of the blue brief, is an example where several theories went to the jury. Some of them were legally deficient. One of them was legally sufficient. And the court said, we have to send it back for a retrial on the one that was legally sufficient. What about Clark v. Taylor? Excuse me? In Clark v. Taylor, we had almost this exact same situation with the general verdict form where we said as long as it could stand for one, that was sufficient. Well, but here we have legally deficient claims that were going to the jury and we have counsel arguing the legally deficient facts to the jury as support for retaliation. It's not retaliation to try to delicately ease somebody out or find an exit strategy for an unqualified employee if the company is doing it on the basis of the lack of qualification. But you could have an unqualified employee who doesn't want to leave. You want them to leave. And the reason you want them to leave is because they're complaining about the job and insisting on accommodation. And the accommodation may not be reasonable, but it's plausible. And you retaliate, you're liable. Well, it's also, and Larry Moyer says, if the inadequate claim may have affected the verdict. And here we have not only may have, quite likely did. Because if the employee is not qualified to perform the task the employer needs, and the evidence was that the employer was already starting to look for another manager who could perform these functions. That manager does, in fact, perform the functions today. This sounds like a lot of insufficiency of the evidence on the discrimination claim arguments. Well, Your Honor, I think. Which then brings forward the waiver issue in terms of whether there was any preservation of a sufficiency claim. Your Honor, I think this court's decision in Blockle is really on all fours here. Because there, as here, counsel said, I'm moving for a directed verdict. There, as here, immediately.  In that case, as I read it, the lawyer says, I have some issues I want to raise in the Rule 50 context. And the judge says, thank you, denied. Here, the lawyer doesn't even, apparently not know or not planning to even make a Rule 50 argument. Judge Sorkin invites it. He just boilerplate says, I'd make a directed verdict. The judge says, okay, denied. And then the judge writes a whole opinion that explains the facts that happened there that make it very different from Blockle. And the facts that Judge Sorkin was highlighting were all things that could have been done after the court had orally denied the motion. All of those were equally true in Blockle. The opportunity to come back and ask the court to reconsider. The opportunity to submit a subsequent motion. All of those equally were true in Blockle. When a judge invites a directed verdict motion, the judge doesn't even have to invite it. The defense counsel are obligated to bring it. If the judge invites it and someone just mutters two or three words, how does that apply to the motion? This was taken a little bit out of context because the plaintiff had not already rested on their evidence. And the court says, we're going to treat it as though that it happened. There was one procedural thing that needed to be done. But the purpose of Rule 50A is to give the plaintiff an understanding of those things that the defense says is inadequate so that they have a chance to correct it. That is what the advisory notes say the purpose of the rule is. And you did not provide them with that opportunity. But here, this was the same argument that had been made at summary judgment. This was the same issue that was alive. All the parties knew what it was. And that's why the court said, and that will be denied, to move along. But I want to make sure that I underscore that this is not a punitive damages case, Your Honor. Let me interrupt you for a minute because I think Judge Selye might have had a question. Oh, I apologize, Your Honor. Yeah, what I want to know is I had always assumed that there was some burden on the mover to put his grounds for his motion on the record. And the lawyer for the company in this case didn't lift a finger. Just went right on to other matters. There was no indication as in Blockle that there were issues he wanted to raise. Well, Your Honor, I think that the rule in Blockle establishes that when it has immediately been denied, once the counsel says I'm going to move for a directed verdict, that at that point it's preserved and there's no obligation to come back to the judge. Any trial lawyer knows that what you're saying hinges entirely, might be true in some cases, might be true in others. It depends on the cadence, the tone, the context in which it occurs. Your Honor, I think that the rules of waiver, because they are so momentous, have to be very clear. And I do think that any counsel having read Blockle would believe that in the circumstances of this case. Blockle, in your view then, Blockle just eliminates the rule that is in Rule 50A that it's the job of the plaintiff, the party moving to state the reason. If the court immediately denies. But I do have two other arguments that I want to make sure that I preserve, which is you mentioned the instructional error. I think you saved rebuttal time. I do want to see if I could just say two seconds, Your Honor. You saved rebuttal time. Okay. But for rebuttal, I would like to be able to address that the instructional error has been waived by counsel.  Yes, Your Honor. Sit down. Thank you, Your Honor. Would counsel for the appellee please introduce themselves on the record to begin? I'm not sure if it's good morning or good afternoon, Your Honors. Patrick Hannon on behalf of the plaintiff. And may it please the court. Just to pick up where we left off on the waiver issue. I think Judge Aframe is precisely right in terms of how Judge Sorokin addressed this in the ruling on the post-trial motions. Judge Sorokin noted that he, quote, distinctly recalls the salient exchange. That being the exchange when the deficient motion was being made. That there was nothing that Judge Sorokin did or did not do in order to influence counsel's decision of whether or not to comply with the rule. He provided an opportunity, as the judge said. The jury was off having coffee and snacks. It was as much time as counsel needed to take. They took the amount of time that they wanted. And the judge ruled on the motion. There's no obligation on the part of the judge to invite further argument. There's no obligation on the part of the judge to count to five Mississippis before he makes the ruling. As Judge Coyote pointed out, you can tell from the context when they're done and here they were done. And they've never argued otherwise. I'd also point out that the appellant, they admit in their opening brief that Judge Sorokin did not prevent them from stating the grounds. On page 31 of their brief, they specifically state that the reason why they did not state grounds was because they didn't think it was necessary. They didn't think it would do any good or that Judge Sorokin wanted to hear it. And obviously that's not the rule. So that's the waiver argument. But putting aside the waiver on the Rule 50, just sort of getting into the merits here, the essential functions question is by its nature fact-intensive. And I think that the appellants tried to present sort of the analysis of. But here, the thing that troubles me about that is before the employer had any idea it was dealing with any sort of handicap of any type, the employer and facing significant financial issues in life, the employer decides to add a very, what it regarded as an important part of the job. Employers can do that. And so how do we describe it? It seems to me that comes. It's very hard to turn that into a wrong. Well, there's no evidence that that's actually the case. So what their evidence they told her about this new responsibility before they knew she had any problems. So. So the evidence of the meeting in December of 2017 in the context of this 360 review is that Mr. McKerry, the supervisor, goes to Dr. Menninger and indicates he has some ideas. This is something he'd like to talk about, indicating he wants to have a discussion with her. So this is not a, he has not disclosed that they've come up with some new specific job responsibility. This is an idea. This is a discussion he wants to have with her about ways that he can try to find her more forward facing. And in terms of what the genesis of that desire was, really what the evidence shows, and again, viewing this in the light most favorable of the verdict, is this wasn't that the company was struggling. The company was doing great. It was making money hand over fist. What it was was that Dr. Menninger was actually really good at this. That despite the fact that it was extremely hard for her to get up on her feet and do these formal presentations, the people seeing it, they didn't see any of that. They didn't see the internal turmoil. And she was extremely smart. And they had this wonderful asset. And the idea was, hey, let's see if there are ways that we can work with you on your role and come up with ideas of how to get you more in front of customers. Perfectly legitimate for an employer to do that. Absolutely. They want to have that conversation. Absolutely right. What happens after, though, after she disclosed her disability is that conversation doesn't happen. Rather than having a conversation with Dr. Menninger about ideas, about how to change her role, what we get is we get this bucket list from Mr. that lumps a whole bunch of things together that indicates potentially very large groups, potentially very, very frequent occasions. And the appellant here that has the burden to show that all this stuff is essential, they offer no evidence. Isn't that the beginning of an iterative process? Well, I'm sort of addressing two separate issues. So one concerns the sort of birth of these alleged essential functions. Where do they come from? Did the company actually engage in some deliberative process to say, yes, these are things that we need her to do? And there's no evidence of how Mr. McKerry came up with that list. When he was asked under questioning, you know, how did you come up with these buckets, I don't remember. Did you speak to anybody else about these buckets? I don't remember. So in terms of carrying their burden to show that all these functions are essential, they don't do anything above and beyond say that these are things that her employer wants her to do. But that's always the case in accommodation cases. By definition, these are things that the employer wants the employee to do. And what we're doing is we're sort of balancing the employer's legitimate need for this employer to do them versus the obligation to provide some accommodation. And I think the really critical thing not to lose sight of is she was able to do all of these things. She'd done them. But her doctor said she wasn't without harming herself. That's not true. That's not what her doctor said. That's the way that they characterized her doctor's words, but her doctor never said that. What her doctor did was she disclosed that there were certain aspects of these engagements, the public speaking and the social context of it, that those made it difficult for her. Well, she said she would be harmed by it. No, she never said she would be harmed by it. She said it made it difficult for her that she'd experience various somatic symptoms. Well, what I understood is it kind of went in two steps. So the first reasonable accommodation request, I'll describe it as more moderate, more she can do this, but she needs this more time. She needs more information about the particular speaking opportunities. And then the second one, when the surrogate slash reader comes in, is more definitive and says, this will really harm her if she has to do this, so here's a way we've come up with where she won't have to do it. And then those things are both kind of hanging there, and they focus on the second one. Your closing argument focused on the first one. What do we do with that? Did the second one override? To me, that's part of the case that's hard. I think you have to look at the second one, and then you have to view that in the light most favorable to the verdict, because it doesn't actually say what the appellant here says that it says. They sort of take things out of context. What she does is she provides a bit of psychoeducation, and she explains this, that she wants to make clear that this isn't just shyness. This is a real medical condition. So she again kind of reiterates that this has to do with public speaking. This has to do with social interaction. And then she says, a concrete way of thinking about this disability is to think of it as though, and that's when you get this sort of famous line about her vocal cords not being able to. So it's provided as an example of, you know, this is a real medical thing that we should be considering. I'm sorry. Could you go back to the report? Didn't it say that if those activities, social interaction and public speaking, became more frequent, her anxiety would increase? Yes. But you don't call that her being harmed? Anxiety is a part of life. Every single employee suffers anxiety. In the context of this case where a person has the disorder that she has, her increasing anxiety was not okay. Right. And I think that's an important point to make is that, you know, this sort of stress and discomfort, you know, the fact that she's experiencing stress and discomfort doesn't mean that she can't do the job. And in fact, when that same doctor was cross-examined at trial, she made the point that, well, that's actually how we treat these people. We actually expose them to these folks. So the essential piece of their argument is she asked for a surrogate or a reader, and that is assigning her the essential function. And your, I think, response was, well, maybe yes, maybe no, but we actually asked for something else first, which is not a reader or a surrogate, but more information, more time, more discussion in advance of these events so that she knows exactly what's going to happen and that those things would sufficiently reduce her anxiety. And that was the first request for accommodation. And then the second one addresses the surrogate. How do we think about those? Because they would say the second one is completely unreasonable, and they don't really tell me much about the first one. Does the second one overwhelm the first one? Because it seems to me at the trial you did argue the first one. So how do I think about that, that you made two different accommodation requests? So we're actually looking at sort of two distinct questions. So one concerns whether or not she was qualified for the job. And qualified for the job, first you look at what are the essential functions, and then you ask, could she do those? And we're assuming for purposes of my question, making speeches to large groups is an essential function. Assume that for right now. And the undisputed evidence was she was able to do that without accommodation. She did it well. She did it well. She was getting high marks. Even if you tack on to that, that the jury was required to find that she needed to do more of it, there's no evidence as to how much more. We don't know if this is one extra presentation a year, ten extra presentations a year. And there's no evidence that compelled the finding that whatever that added frequency was going to be so much that it was going to kind of push her over the edge. So that's on the sort of plain speaking part. In terms of looking at the actual, whether or not any of the bucket items could have been accommodated. The reason why I didn't spend a lot of time arguing that second list is because none of the stuff in the bucket ever came to fruition. So she remains employed in this position until mid-late June of that year. And all of these extra activities that they say were going to be required, none of them actually came about. It was sort of business as usual. And there's no evidence that that was done as an accommodation to her. How do you deal with Dr. Kasemian's note of February 14th that because of her disorder, her brain and body are not able to tolerate public speaking engagements slash socializing. And that's when he then proposed that there be a reader or surrogate. But that's taken out of the context that I just described. So that bit about unemployment. Suppose, assume, arguendo that we read that as the employee's doctor telling the employer that the employee cannot do certain functions without harming herself. If we were to so conclude, would you still have a case for discrimination? I think it would depend upon the sort of level of harm. There's certainly cases out there, and they cite these in their reply brief. They never cited them previously in this case. The idea that if you as an employer get a certification from a doctor that says, no, this person's not capable of conducting that kind of activity, that the employer is justified in sort of terminating the employee on that basis. They never got anything of that sort here. What they got here was they got some information about what the disability was. They got some information about how the disability impacted her. In terms of the mix of the information they also had, they had that she had done these activities. Her doctor noted she'd done these activities in part because she was able to medicate for them. Which is part of, at that end of itself, is a reasonable accommodation. So there's no dispute that the job, as it existed in December of 2017, it was a job that she was capable of doing. So really, in order to get anywhere, they need to show that there were essential functions added after December 2017. And that those added functions as of December 2017 were so onerous that she was no longer able to do the job. And certainly there's sort of information that a fact finder could look at this and say, you know, it was legitimate of them to ask questions. It was legitimate of them to have some concern. But as we pointed out, at the district court level, and we actually got a jury instruction on this, the law accounts for that. If there's some ambiguity and if you have some concern, you as an employer can ask for that certification. The employer actually has the right to go and request an independent exam, specifically to answer this question of can they or cannot do this task safely. And it's important here that my brother argued today that they were doing the humane thing here in terms of trying to work with her. They were trying to work her out. They said the exact opposite at trial. Throughout trial, they continued to say, you know, we didn't really make a determination whether or not she could do this job or not. That was between her and her doctor. She was in good standing. She was a good standing employee. We wanted her here. We wanted to work with her. We were affirmatively trying to work with her, trying to find ways, all of which was a lie, right, because we saw the internal communications. But this idea that they can come now and say, well, we were justified in trying to push her out because we had actually determined that she wasn't qualified, that doesn't actually add up with what they did. And it certainly doesn't add up with what they argued at trial. That's an entirely different theory. The strangest part of this case to me is the break, the interactive process then went away, and yet it seems like that's a big problem in the case, because after the second request for accommodation that Judge Chicago just read from, I don't know if I'll call it backtracking, but when I feel like the company felt like, great, we got the doctor to say the thing we want to create, she can't do the job, and then she says, well, wait, I can do it. And then the whole thing just kind of ends up that everyone goes in their separate camps and nothing else seems to happen, which seems like a strange way that this thing unfolded, which is why I get back to, you know, so we're left with these two accommodations that were kind of hanging out there. Accommodation number one, more, I'll call it mild, I just want more information. Accommodation number two, no, I need a reader. Then we go to our separate camps and none of that has ever really fleshed out any further. Where does that leave the case at the end? Well, where it leaves the case is what they actually did was which they turned to Plan B in that recognizing that the doctor's note wasn't enough. If the doctor's note was enough to get her out the door, they didn't need Plan B. They didn't need to come up with this whole exit strategy. But they recognized that at the very least it was ambiguous and she'd offer to give more information. They didn't ask for it. So what the record shows they did was they come up with this plan to manage her out in terms of starting accusing her of not sufficiently watching over her labs, having all of these problems. That's what they did. And these are all factual issues for a jury. The judge looked at this stuff multiple times. This is not the case, particularly on plain error review where the evidence here was so lopsided that a reasonable fact finder could not conclude that she was indeed qualified and that indeed they had broken the law in the manner that she alleged. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? You have a three-minute rebuttal. Doug Howard, on behalf of PPD. Judge Kayada, your questions with respect to Dr. Kasimian's diagnosis of the problem and how her increased social interaction would exacerbate her condition is exactly the problem here. It puts the employer in an impossible position. The employer will be liable if the employee suffers injury because the employer insists that she do the task. And now the employer is liable if the employer takes the doctor's word. But you had mixed statements from the doctor, right? The first statements were not as unequivocal as the second. So it seems like there are sort of two things going on. I understand why you might like the second one better. But what about the first one? The first letter both states very clearly that she will experience greater anxiety and would make it much more difficult if not impossible for her to do her job. And says if this must happen, you should give us a chance to come up with a plan. And the ability to come up with a plan is what happened after that. Because Mr. McCary then spells out in the five buckets more detail. But it was argued to the jury that that was the accommodation that was denied, right? That was argued. Two of the five buckets were granted. Three of the five were not. Because having now provided that greater detail in order for a doctor, a manager, to consult with her treating doctor in terms of what to do, they came up with at that point the surrogate or reader. That was then the greater plan. And in terms of whether that was argued to the jury, this is at JA 1759, this is counsel's perspective. They both argued to the jury. And so the jury had before it the idea that the reader is a reasonable accommodation. Counsel argued, look at Dr. Kasimian's letter and compare that to what the judge tells you is a reasonable accommodation. And you'll be liable. So we think quite possibly. But I read the closing. They say then, but that's not really what we're focused on. We're really focused on giving her more information and more time to prepare and plan. That's what we think. They wouldn't give her for buckets three and four, whatever they are. And that request came before the buckets ever came. The buckets were the more information to allow her to plan. And it was in response to that that she said. So she can only meet with one or two people. Not a whole staff. But even if there could be liability, this is never a punitive damages case. The punitive damages for outrageous, malicious conduct. Not making a mistake about where the law is. The reason NAMS. You didn't accommodate her. You retaliated against her. We don't know if it was based on the retaliation, the punitive damages. Did you ask for that? Yes, we asked for the damages, both punitive and compensatory, to be broken out by the theory of liability. But the judge did not give that. So there's a whole bunch of bad conduct. Some may be worse than others. You didn't accommodate her. That's not good. But maybe it's a close legal question. I don't know. And you retaliated against her, which is not good in any circumstance. Jury, here are the right factors about punitive damages. What's the right thing to do here? The right thing to do would have been to give judgment as a matter of law in our favor. For the same reasons that the defendants did in Walgreens and in Acushnet. And in Friendly's. Because there, it was a manager who was saying, somebody else can do the menial tasks. I'm the manager. I can delegate. And even there, this court said, you can't delegate because you have a responsibility to do that. Here, there's no way that a surrogate, a stand-in, can do the job of persuading a client to hire the company. And this court's case law makes that clear. And even if, I think any employment lawyer would have told the company the same thing. If she's not qualified, you do not have to retain her. But if that is the basis, not just for liability, but for $10 million in punitive damages, the employers are in an impossible position. And that's what we ask this court to correct. Thank you. I do have a question for counsel. Did this case go through the court's camp process? Yes, Your Honor. Thank you.